Gary GREENBERG, Richard Savadel, Free Libertarian Party, William D. Burt, Socialist National Committee, Socialist Party of America, Kenrick G. Kissell, Bill Douglas, Peace and Freedom Party, Lewis B. McCammon, Plaintiffs,

J. Daniel Mahoney as State Chairman and on behalf of the Conservative Party of the State of New York, Plaintiff-Intervenor,

Bert DeLeeuw as Executive Director and on behalf of Citizens' Party, Plaintiff-Intervenor,

John B. Anderson, National Unity Campaign for John Anderson, and Uriel P. Bauer, Plaintiffs-Intervenors,

v.

W. F. BOLGER, Theodore Troy, George F. Shuman, United States Postal Service, Board of Governors of the United States Postal Service, Postal Rate Commission, Defendants.

No. 80 Civ. 0340.

United States District Court,
E. D. New York.

June 20, 1980.

---

4. Ms. Currie failed to present evidence on her other individual allegations.

New York Civil Liberties Union, New York City, for plaintiffs; Arthur Eisenberg, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for plaintiff-intervenor John Anderson, et al.; Paul Dodyk, New York City, of counsel.

Baker, Nelson & Williams, New York City, for plaintiff-intervenor J. Daniel Mahoney, et al.; John Dellera, New York City, of counsel.

Stuart J. Beck, New York City, for plaintiff-intervenor Bert DeLeeuw, et al.

Edward R. Korman, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for defendants; Reuben S. Koolyk, Asst. U. S. Atty., of counsel.

## TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . 764

 A. Statutory Scheme . . . . . . . . . . . . 764
 B. Plaintiffs . . . . . . . . . . . . . . . . . . 766

 1. Socialist Party of America . . 766
 2. Libertarian Party . . . . . . . . 766
 3. Peace and Freedom Party . . 767
 4. Conservative Party of the
 State of New York . . . . . . 767

5. Citizens' Party .......... 767
6. National Unity Campaign
 for John Anderson and
 Uriel P. Bauer ......... 767

C. Independent Candidates and
 Third Parties in the
 United States ............. 768

1. History of Party System .... 768
2. Obstacles ............... 770

II. LAW ........................ 772

A. Waiver of Exhaustion
 Requirement ............. 772
B. Postal Service Within Apparent
 Statutory Authority ........ 773
C. Constitutional Questions ....... 773

1. Due Process in Enactment .. 773
2. First Amendment ........ 774
3. Equal Protection ......... 778

 a. Fundamental Rights .... 778
 b. Non-speculative Harm ..779
 c. Governmental Interests ..779
 (1) Facilitating Public
 Expression ....... 780
 (2) Integrity of
 Elections ........ 780
 (3) Protecting Scarce
 Fiscal Resources .. 780
 (4) Protecting Against
 Factionalism ..... 781

 d. Balancing ............ 781

III. INDEPENDENT CANDIDATES ..781

A. Barry Commoner ............ 782
B. John Anderson .............. 783

IV. REMEDY ..................... 784

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge.

This action by five political parties and the National Unity Campaign for John Anderson and Uriel P. Bauer, seeks an injunction either invalidating a portion of the Postal Service Appropriation Act, 1980, Pub.L.No. 96–74 Title II, 93 Stat. 562 (1979), as unconstitutional, or, alternatively, directing defendants to afford plaintiffs the special reduced rates for bulk third class mailings available to the National, State and Congressional committees of the Democratic and Republican parties. The two major parties pay 3.1 cents per letter, while all other parties pay 8.4 cents.

 A critical duty of the courts in our system of constitutional government is to protect a minority against a majority's attempt to reduce human rights. In our democratic republic it is essential that each person be afforded the right of equal access to the marketplace of political ideas and the opportunity of influencing governmental policy through election and persuasion of government officials.

 The vital role played by third parties and independent candidates in changing the political environment; the constitutional rights such parties have to communicate programs, goals and candidacies; the monopoly that is enjoyed by the Postal Service; and the very real burdens denial of preferred postal rates places on small or new political parties, require that the plaintiffs enjoy access to the mails equal to that of the Democrats and Republicans.

## I. BACKGROUND

The postal service is a monopoly; no competing private agency for carrying mails is permitted. 18 U.S.C. § 1696 (crime to establish private postal system); 39 U.S.C. §§ 601–606; *United States Postal Service v. Brennan*, 574 F.2d 712 (2d Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979); *National Ass'n of Letter Carriers v. Independent Postal System*, 470 F.2d 265 (10th Cir. 1972). As "one of the main government facilities relevant to a system of freedom of expression . . .," T. Emerson, *The System of Freedom of Expression* 647 (1970), access to the post is indispensable to the exchange of ideas.

### A. Statutory Scheme

The Postal Reorganization Act of 1970 created the Postal Service as "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. Though *generally* prohibiting subsidization of one category or class of mail by customers who send other types

of mail, 39 U.S.C. §§ 101(d), 3622, exceptions authorize special treatment for certain types of mail. For example, special rates were authorized for bulk third class mailings of qualified non-profit organizations and the 1970 Act allows Congressional appropriations to the Postal Service to reimburse the Service for any loss caused by this lower–than–cost–based rate. 39 U.S.C. § 4452(b). These special rates are available, however, only if Congress makes the necessary appropriations.

In 1978, as part of the Overseas Citizens Voting Rights Act Amendments, Pub.L.No. 95–593, § 11(c), 92 Stat. 2538 (1978) (1978 Act), Congress amended Title 39 extending the benefit of reduced rates to "qualified political committees"—defined as "a national or state committee of a political party, the Republican and Democratic Senatorial Campaign Committees, the Democratic National Congressional Committee, and the National Republican Congressional Committee." 39 U.S.C. § 3626(e)(1), (2). As a result of this amendment, the original plaintiff political parties, Socialist Party of America, Libertarian Party, Peace and Freedom Party and plaintiff-intervenor, the Conservative Party of New York, among others, enjoyed reduced third class bulk mail rates.

This preferred rate allowed plaintiffs substantially to increase the frequency and volume of their mailings. Plaintiff Free Libertarian Party was able to increase its mailings from approximately 700 pieces per month to as many as 2000 per month. Testimony of Gary Greenberg, Transcript of Hearing of March 6, 1980, at p. 13. The other original plaintiffs achieved similar increases, Testimony of Kenrick G. Kissell (Socialist Party), Transcript of Hearing of March 5, 1980, at pp. 12–13, as did intervenor Conservative Party, Affidavit of J. Daniel Mahoney.

The category of political organizations eligible for benefits flowing from Congressional appropriations were, however, defined more narrowly by the 1980 Postal Service Appropriation Act (1980 Act). It provides, in pertinent part, that, "no funds appropriated . . . shall be available for implementing special bulk third–class rates for 'qualified' political committees authorized by Public Law 95–593 [1978 Act], other than the National, State, or Congressional committee of a major or minor party as defined in Public Law 92–178." Pub. L.No. 96–74, Title II.

Public Law 92–178, the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001–9013 (Campaign Fund Act), defines a "major" party as "a political party whose candidate for the office of President in the preceding presidential election received, as the candidate of such party, 25 percent or more of the total number of popular votes received by all candidates for such office." 26 U.S.C. § 9002(6). A "minor" party is defined as one whose last presidential candidate received more than 5 percent but less than 25 percent of the total popular vote. 26 U.S.C. § 9002(7). A party whose candidate received less than 5 percent of the vote is a "new" party. 26 U.S.C. § 9002(8).

Congressional debate demonstrates—what is clear from the provision itself—that the 1980 limitation was adopted to preserve the special rate for the two dominant political parties while denying it to all others. Representative Glickman proposed at the beginning of the debate on the 1980 Act an amendment to eliminate the special rate for all political committees. 125 Cong.Rec. H–5888 (July 13, 1979). Responding to objections that this amendment would "throw the baby out with the bath water," id. at H–5891, Representative Ford proposed the limitation that was enacted. He expressly described the purpose: "we did not intend that the American Nazi Party or the Communist Party, could automatically walk in and get this privilege." Id. Despite the observation of Representative Glickman that the amendment would sharply restrict minority parties' access to the mails, id. at 5895, and Representative Bedell's remark that "if a new party was formed . . . that . . . had substantial support, it would be placed at a disadvantage as compared to" the Republican and Democratic Parties, id., the Ford Amendment was adopted.

The statutory scheme presents some difficulties. The definitions of "major", "minor" and "new" parties are derived from the Campaign Fund Act. 26 U.S.C. §§ 9001–9013. But, unlike the Campaign Fund Act, the 1978 Act does not require major or minor parties to accept expenditure or contribution limitations as a condition of the receipt of public funds in the form of a postal subsidy. Moreover, the 1978 Act—unlike the Campaign Fund Act—makes no provision for the possible reimbursement of a political party unable to qualify for advance funds given past results (or the lack of results in the case of a newly created party), but making the requisite showing in a current election. In addition, the 5 percent requirement reflects a concern for national impact neglecting the local or statewide success that some third parties enjoy. Finally, there is no specific reference to independent candidates.

Pursuant to the 1980 Act, the Governors of the Postal Service adopted a resolution denying the preferred rate for bulk third class mailings to committees of "new political parties"—i.e., those neither Democratic nor Republican. 39 U.S.C. § 3627. Plaintiff political committees, together with twenty–four other "new" political committees, were informed by letter that, as of December 16, 1979, they would no longer be entitled to the special mailing rate. This raised their cost of mailing from 3.1 cents to 8.4 cents per piece and sharply restricted their ability to use the mails. Affidavit of Theodore W. Troy, ¶¶ 16, 17; Affidavit of Gary Greenberg, ¶ 9; Affidavit of Lewis McCammon, ¶ 6; Affidavit of J. Daniel Mahoney, ¶ 4.

### B. Plaintiffs

The "new" political parties and the independent candidacy of John Anderson present views to the electorate substantially different from those of the two major parties.

### 1. *Socialist Party of America*

The Socialist Party of America was founded in 1901 when the Socialist Democratic Party merged with the Rochester wing of the Socialist Labor Party. Kenrick Kissell, the National Secretary of the party, described the party philosophy as follows:

we believe it is essential to have some form of economic as well as political democracy in that the democratic decision–making process should be extended to other views of life other than simply the political or government.

Transcript, March 5, 1980, at p. 5.

The Socialist Party of America has 500 members, 40 of whom reside in New York, and its mailings go to more than 3000 recipients. Its local chapters form state committees. Delegates to a National Convention select a National Committee.

In 1976, the Socialist candidate for President, Frank P. Zeidler, was on the ballot in seven states receiving approximately 6,000 votes or less than 0.01% of the total popular vote of 81,552,331. The highest percentage he achieved was in Wisconsin where he attained 0.2% of the total vote. *See* Congressional Quarterly, *Guide to 1976 Elections* (W. Walker ed. 1977).

### 2. *Libertarian Party*

The Libertarian Party was founded in 1971. Its National Committee charters new state organizations. These state organizations, in turn, send delegates to a national convention. Every state but one has a state organization. In New York, because of the state's election laws, the organization is called the Free Libertarian Party. The party has 6000 contributors and in 1979 there were 266 dues paying members.

Its credo, briefly stated, is:

By contemporary labels, the Libertarian Party is neither left nor right wing. It bases its political position on one simple principle: each individual has the absolute right to exercise sole dominion over his or her own life, liberty and property (so long as he or she also respects the equal right of every other individual to do the same). The Party platform, applying this principle to the issues of the day, contains planks opposing the draft, cen-

sorship, coercive taxation and victimless crime laws. . . .

The libertarian vision looks forward to a society in which individuals are free to pursue their own happiness, cooperating with others voluntarily to seek common goals. A society with (not one but) many utopias, each built, individually or collectively, by the efforts of free and responsible human beings.

*See The Libertarian Party. An Introduction* (1979).

In 1976, the Libertarian candidate for President was Roger McBride. He received 173,019 votes—0.2% of the total popular vote. In Alaska, Mr. McBride had 5% of the popular vote; his next best showing was in Hawaii where he obtained 1.3% of the vote. *See* Congressional Quarterly, *Guide to 1976 Elections*, (W. Walker, ed. 1977).

### 3. *Peace and Freedom Party*

In 1976, Margaret Wright was the Peace and Freedom Party's candidate for President. Ms. Wright received 50,000 votes, .06% of the total popular vote. Her highest percentage was received in California where she garnered 0.5% of the total vote.

### 4. *Conservative Party of the State of New York (plaintiff–intervenor)*

The Conservative Party of the State of New York has run candidates for governor of the State in each gubernatorial election since 1962. In 1978, its candidate received 242,972 votes.

The party has also been an influential force in other elections. In 1970, James L. Buckley was elected with 2,179,640 votes to the United States Senate against Democratic and Republican opposition. Conservative Party candidate James D. Griffin was elected Mayor of Buffalo, New York in 1978, over the opposition of candidates from the two major parties. *See* J. Daniel Mahoney Affidavit ¶¶ 2, 3.

In 1976, the Conservative Party listed Gerald Ford on the ballot in New York as its candidate for President. He received 274,878 votes, or slightly more than 0.3 percent of the total national popular vote. The Conservative Party of New York provides a striking example of one of the serious consequences of the 1980 Act. Though quite successful on a state and local level, the party is unable to satisfy the requirement that it receive five percent of the nationwide popular vote.

### 5. *Citizens' Party (plaintiff–intervenor)*

The progenitor of the Citizens' Party, the Citizens' Committee, was established in April 1979 as a political committee. The Federal Election Commission indicated that the Citizens' Party would qualify as a "political party" pursuant to the Federal Election Campaign Act, 2 U.S.C. § 431(16), as soon as it nominated a candidate for any federal office whose name appeared on any state ballot. Advisory Opinion 1980–3, March 4, 1980.

The Citizens' Party held a National Convention in April 1980. Barry Commoner and La Donna Harris were nominated as the Party's Presidential and Vice–Presidential candidates, respectively. Two hundred and seventy one delegates representing 32 states participated in the Convention.

The Citizens' Party has approximately 5,000 members. It has 32 state committees and the candidates of the Party have thus far satisfied ballot access requirements in seven states. *See* Bert DeLeeuw Affidavit ¶¶ 3, 4, 5, 7, 9.

### 6. *John Anderson and the National Unity Campaign for John Anderson and Uriel P. Bauer (plaintiffs-intervenors)*

Unlike the other plaintiff political parties, John Anderson and the National Unity Campaign characterize their effort as an independent candidacy. The distinction, however, is, for purposes of legal implications relevant to this case, more one of form than substance. *See* discussion in III, *infra*.

John B. Anderson is a ten-term Republican Congressman from Illinois who, after competing unsuccessfully in the Republican presidential primaries, in April 1980 an-

nounced his independent candidacy for the Presidency. Since its inception, the National Unity Campaign has secured a place for John Anderson's name on the ballot of eight states and it is seeking to meet ballot requirements in all states and the District of Columbia. This effort has resulted in the gathering thus far of more than 225,000 signatures. The campaign has also raised over $1,300,000 in private contributions in amounts of $1,000 or less as required by the Campaign Fund Act.

The National Unity Campaign serves the same general functions as those performed by the political parties for their respective candidates. For example it plays the central role in raising funds; it determines the amount of money to be allocated to particular efforts in particular states; it coordinates the formulation and expression of the candidates' positions on political issues; and it is responsible for determining the content of national advertising campaigns. *See* Francis E. Sheehan, Jr. Affidavit ¶¶ 3, 4, 8, 9, 10, 12.

This brief description of each of the plaintiff political parties and of the National Unity Campaign reveals that either because they are newly created or because their support is only local or statewide or because they failed to generate sufficient interest, none approached the nationwide 5 percent figure in the 1976 presidential election necessary to qualify for the preferred postal rate. Only the Democratic and Republican parties made the requisite showing. The position the plaintiffs find themselves in is not surprising given the history of independent candidates and third parties in the United States.

C. Independent Candidates and Third Parties in the United States

Since the earliest days of the Republic, political parties in general and third parties and independent candidates in particular have not been viewed with great favor by the majority partly because of fear that factions might split the nation. *See* N. Cunningham, *The Making of the American Party System* 19–20 (1965). This fear of

factionalism has continued to the present day. *See, e. g., Storer v. Brown,* 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974) (California statute requiring nominating petition signed by no less than five percent of voters in last general election valid to protect electoral process from "splintered parties and unrestrained factionalism" and to provide an understandable ballot).

The place of independent candidates and third parties in the American political process can be understood only in light of this strong bias against splintering and the countervailing fear of creating and perpetuating an oppressive political majority. Writing in the early 1830's, Alexis de Tocqueville identified an essential concern of the framers of the Constitution when he suggested that the tyranny of the majority might be the basic flaw in the American system. His view was that:

> the main evil of the present democratic institutions of the United States does not arise, as if often asserted in Europe, from their weakness, but from their irresistible strength. I am not so much alarmed at the excessive liberty which reigns in that country, as at the inadequate securities which one finds there against tyranny.

A. de Tocqueville, *Democracy in America* 115 (R.D. Heffner, ed. 1956). *See also,* James Madison, *Federalist, No. 51* ("Ambition must be made to counteract ambition."). This concern has recently been restated by Professor Ely. *See* J. H. Ely, *Democracy and Distrust* 69 (1980). *See also, e. g.,* M. Perry, *The Constitution, the Courts and Human Rights* 3.46 (Preliminary ed. 1980); Ely, Toward a Representation—Reinforcing Mode of Judicial Review, 37 Md.L.Rev. 451 (1978); Bork, Neutral Principles and Some First Amendment Problems, 47 Ind.L.J. 1, 3 (1971).

1. *History of Party System*

This tension between "tyranny of the majority" and "factionalism" is mitigated by the two party system. But, though political parties may have been an inevitable product of the political framework established

in 1789, the two party structure was not foreseen. *See* R.A. Dahl, *Pluralist Democracy in the United States* 210 (1967).

The factions, coalitions and alliances of earlier days lacked the requisite organization, permanence and identity of what we now call political parties. R.A. Dahl, *Pluralist Democracy in the United States* 205 (1967). *See also, e. g.,* A.H.M. Jones, *Athenian Democracy* 130–31 (1957) (groups and cliques existed among politicians in Athens but were "probably based on personalities rather than principles, and seem to have been temporary."). Professor Dahl concludes his view of these early organizations explaining:

> . . . like the Guelphs and the Ghibellines of medieval Italy or the Piagnoni and the Arrabblat of Savanarola's Florence, factions typically settled their differences sooner or later, as they had come to do during the last century of the Roman Republic, by bloodshed.

Dahl at 205.

The eighteenth century saw the development of groups more closely analogous to the modern political party. In Britain:

> . . . Whigs and Tories did not constitute political parties as they came to be in the late nineteenth and twentieth centuries. Those labels were often adopted by, or foisted upon, men who had little in common and few or no real ties. In 1714 and for many years thereafter, the basic political unit was the group or connexion, often called a party, formed under the leadership of a successful politician.

A.S. Foord, *His Majesty's Opposition 1714–1830* 20 (1964); *see also, e. g.,* D.A. Rustow, *The Politics of Compromise* 11–12 (1955) (comparable Swedish developments). These short-lived groups possessed only the roughest similarities to present-day parties. R.A. Dahl, *Pluralist Democracy in the United States* 206 (1967).

In the early 1790's "most Americans did not want parties." J.M. Burns, *The Deadlock of Democracy* 27 (1967). One party—the Federalist—existed and it was from Federalists that much of the objection to the formation of opposition parties was

heard. *See, generally,* R.A. Dahl, *Pluralist Democracy in the United States* 207 (1967). Despite this opposition, Thomas Jefferson and Madison were able to organize the first Republican Party. The Jeffersonians' success marked the establishment of the two-party system in the United States. Professor Dahl has explained:

> The institutions that have been used ever since to mobilize party support in Congress were well developed by the end of Jefferson's two terms in office: the caucus of the party faithful to determine the party line; the election of a partisan rather than a neutral speaker of the House by the majority party; the development of recognized party leaders; close collaboration between the President and his party leaders in the Congress; and the judicious use of patronage by the President to solidify support.

Dahl at 211.

Even at this early stage the majority attempted to utilize its power in Congress to neutralize opposition. The much reviled Alien and Sedition Acts enacted by the Federalists were the form taken by this attempt at political monopolization.

The growth of the two-party system and its domination of national elective offices—the Presidency and the Congress—is by now a distinctive characteristic of American politics. Given that a frequent pattern is for Western democracies to have more than two important parties (often with a resultant destabilizing influence as in Italy and France), this settled form is a curious phenomenon.

Nevertheless, third parties have been frequent participants in the national elections since 1828. *See, generally,* D.A. Mazmanian, *Third Parties in Presidential Elections* 4 (1974). They have not achieved much success.

Professor Dahl, writing in 1964, prior to George Wallace's 1968 bid for the Presidency, explained:

> Since 1860 every presidential election has been won by either a Democrat or a Republican; in only four presidential

elections during that period has a third party ever carried a single state. . . Since 1862 one of the two parties has always had a clear majority of seats in the House; in the Senate, independents or third party members have prevented a clear majority during a total of ten years. The number of seats held by third party members is almost always extremely low.

R.A. Dahl, *Pluralist Democracy in the United States* 214 (1967). *See also* M. Duverger, *Political Parties* 309–10 (1964).

Though there have been numerous third parties, only ten have been significant in the sense that they received more than ·5 percent of the total popular vote.

Significant Third Parties in Presidential Elections, 1828–1976

| Year | Party | Percentage of total votes cast |
|---|---|---|
| 1832 | Anti-Mason | 8 |
| 1848 | Free Soil | 10 |
| 1856 | American | 21 |
| ·1860 | Breckinridge Democratic | 18 |
| | Constitutional Union | 13 |
| 1892 | Populist | 9 |
| 1912 | Theodore Roosevelt Progressive (Bull Moose) | 27 |
| | Socialist | 6 |
| 1924 | Bob LaFollette Progressive | 17 |
| 1968 | George Wallace American Independent | 14 |

D.A. Mazmanian, *Third Parties in Presidential Elections* 5 (1974) (the Progressive Party of Henry Wallace won only 2.4 percent of the popular vote in 1948); Congressional Quarterly, *Guide to 1976 Elections* (W. Walker ed. 1977). *See also* W. Weaver, Jr., Anderson Tempts History's Footnotes, *New York Times*, April 26, 1980, at 15; N. von Hoffman, Bucking the System, *The New Republic*, April 19, 1980, at 12.

A classification system that defines minor parties as those attaining more than 5 percent of the popular vote would exclude all but United States history's most successful third parties. In addition, no third party, except Theodore Roosevelt's Progressive Party, which died soon after its birth, has been able to achieve "major" party status.

## 2. *Obstacles*

The failure of third parties to generate greater interest and support has been attributed to a number of factors. As one writer puts it, "for political parties to be effective in any sense of that word, the organization must make the candidate, not the other way around. They have to grow from the bottom up and not be created as personal vehicles for political stars." N. von Hoffman, Bucking the System, *The New Republic*, April 19, 1980, at 12, 15. The failure of third parties, in this view, can be attributed to their reliance on individual charisma. In a sense the cause of a third party's immediate success—the political star—is also the cause of its ultimate demise. The rise and fall of Roosevelt's Progressives, La Follette's Progressives, Debs' and Thomas' Socialists and Wallace's American Independent Party suggests that personality is a requisite element for limited success but not sufficient to boost a third party into a truly significant and lasting position. Nevertheless, the models of Jefferson, Jackson and Lincoln, who helped found long–lasting major parties, have provided an example encouraging repeated attempts to create viable new political establishments.

The ascent and descent of an individual politician's appeal may be only one of a number of factors contributing to the future of a new party. Professor Mazmanian has suggested that the emergence of a successful third party depends on the coincidental combination of four factors: 1) a period of "crisis politics"; 2) a resulting division of popular opinion into a strong and estranged minority view and a broad majority view; 3) rejection of the minority view by both major parties; and 4) a politician or political group willing to capitalize on the situation by creating a new party. *See* D.A. Mazmanian, *Third Parties in Presidential Elections* 136–37 (1974). He explains:

The conditions, however, are cumulative; each is necessary for the next to operate. Hence except in a period of crisis, politically active minorities will usually be absorbed by the major parties; seldom will

they be drawn into a third party. If during a crisis the major parties take opposing positions, little leeway remains for a third party. Lacking a political crisis and an intense minority to appeal to, few politicians of repute will venture to lead a third party effort. But in a period of crisis when a minority emerges and the major parties ignore it, significant third parties appear. Together, the four conditions are sufficient to produce a large third party vote.

*Id.* at 137.

Perhaps most essential is the existence of what a large number of voters view as a crisis. It is in just such a period of danger to the Republic that open debate and the protections of the First Amendment are particularly needed if the people and their representatives are to make sound decisions.

In addition to the problem of finding the right personality and the right series of circumstances, a third barrier facing new parties is the force of tradition and history. *See* R.A. Dahl, *Pluralist Democracy in the United States* 218 (1967). Professor Dahl has defined this obstacle as the "enormous inertia of habit." *Id.* He suggests that "the mere fact then that the Republican and Democratic parties monopolize votes during one generation makes it very much easier for them to monopolize votes during the next generation." *Id.*

In addition to these hurdles, the political system by its very structure creates obstacles to the development of third parties. *See* Rohde, Public Financing of Federal Election Campaigns, 6 Colum. Human Rights L.Rev. 43, 53 (1974). The United States election system is distinguishable from many others because of its "winner–take–all" character.

Under P.R. (proportional representation), voters and politicians can be sure that the proportion of seats won by a party will be very nearly the same as the party's nationwide share of votes. Consequently, under P.R., voters know that they will not throw away their vote by voting for a minority party; and leaders of minority parties do not have much of an incentive to consolidate with other parties in order to win elections. Under the winner–take–all system on the other hand, the share of seats a party wins ordinarily varies a good deal from its share of votes. It is easy to see why: if the voters for all the parties were spread evenly throughout the country, the largest party would win all the seats.

R.A. Dahl, *Pluralist Democracy in the United States* 215 (1967). *See also* M. Duverger, *Political Parties* 218 (1964).

The election laws also present difficulties for third parties. Affecting our political system are restrictions and requirements with respect to securing access to the ballot, *see* P. Blackman, *Third Party President?* (1976); Sims, Jr., Discrimination in State Election Laws Against Third Party and Independent Candidates, 6 Colum. Human Rights L.Rev. 155 (1974), campaign financing, *see Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and recent developments in the laws regarding political patronage, *see Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (government official not a policymaker or a confidential employee may not be dismissed merely because not a member of ruling majority party). The consequence is that third parties continue to face historical and structural obstacles to development that have repeatedly curtailed their chances of success.

Nevertheless, third parties play an important role in American politics. Among the contributions made by third parties are: 1) the development of policies in advance of the time that established parties are ready to act; 2) the modification of the policies of major parties to reflect the view of an emerging third party; and 3) the testing of new programs that eventually prove unworkable or unpopular. *See* W. B. Hesseltine, *Third Party Movements in the United States* 13–14 (1962); Developments in the Law–Elections, 88 Harv.L.Rev. 1111, 1123 (1975).

In addition to these contributions, third parties and independent candidates often have significant impacts on local or state

elections. As evidenced by the Conservative Party in New York, United States Senators and mayors of major cities have been the candidates of a third party or an independent campaign designed to offer an alternative to the two major parties. This local impact may have profound consequences in a city or state.

In light of the obstacles they face and their lack of national success, the ability of third parties and independent candidates to communicate their ideas, recruit new members and solicit funds is directly affected by their access to the mails. Any statutory inhibition on this use would necessarily jeopardize their effectiveness and, perhaps, their very existence. Given the long history of animosity towards factions and the obvious self–interest members of Congress have in handicapping third parties and independent candidates, government regulations that burden the efforts of such parties or candidates demand close examination. We "must remain profoundly skeptical of government claims that state action affecting 'expression can survive constitutional objections." *Federal Election Comm. v. Central Long Island Tax Reform Immediately Comm.*, 616 F.2d 45, 54 (2d Cir. 1980) (concurring opinion), *quoting Thomas v. Bd. of Education*, 607 F.2d 1043, 1047 (2d Cir. 1979).

## II. *LAW*

"If a court can decide a case on non–constitutional grounds, it should not stray into the field of constitutional analysis." *Federal Election Comm. v. Central Long Island Tax Reform Immediately Comm.*, 616 F.2d 45, 52 (2d Cir. 1980). A review of the jurisdictional and statutory issues raised by the parties reveals that this court does not have the luxury of avoiding the difficult questions of constitutional law raised by the 1978 and 1980 Acts.

### A. Waiver of Exhaustion Requirement

The Postal Service had no discretion in implementing the provisions of the 1980 Act curtailing the number of political entities entitled to receive preferred third class mail

rates. Defendants concede, as they must, that intervenor–plaintiffs, as well as the other plaintiffs who did exhaust their administrative remedies, do not qualify for preferred rates. All parties agree that there are no factual issues in dispute. The Postal Service has indicated that the statutory issue raised by John Anderson and the National Unity Campaign is a "pure" question of law not requiring the application of agency expertise. *See* Transcript of Hearing, June 6, 1980 at 63–64.

■ Exhaustion of administrative remedies may be waived by an administrative agency by stipulation, *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976), necessity, *Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976) ("deference" to agency on finality may be outweighed "where a claimant's interest in having a particular issue resolved promptly is so great"); *Jones v. Califano*, 576 F.2d 12, 18 (2d Cir. 1978), or the adoption of a "final" position before completion of the entire administrative review process, *Weinberger v. Salfi*, 422 U.S. 749, 765–66, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975); *Jones v. Califano*, 576 F.2d 12, 19 (2d Cir. 1978); *Reichenthal v. Harris*, 492 F.Supp. 637, 642 (E.D.N.Y.1980). Here, the agreement as to the facts, the absence of agency discretion in denying intervenors preferred third class rates pursuant to the 1980 Act, and the lack of agency expertise in resolving any statutory question effect an implied waiver of the exhaustion requirement. *See generally, Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 49 (2d Cir. 1976), *aff'd*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); Davis, *Administrative Law of the Seventies*, § 30.-00 (1976).

The fast approaching national election is an additional factor in the determination that the Postal Service has waived exhaustion for purposes of the issues raised here. Election cases require courts to be particularly careful to expedite disposition so that excessive procedural niceties do not result in delays making the relief useless in an upcoming election. The need for speed pre-

cludes applications to an administrative body which can only have a foregone result. Both intervenors must still apply for preferred third class mail rates so that even after this court exercises jurisdiction the Postal Service may ascertain if they meet any other criteria established for compliance–though no other critical requirements have been suggested to the court. 39 U.S.C. § 3626(e).

### B. Postal Service Within Apparent Statutory Authority

■ Because the Postal Service was effectuating a Congressional mandate in accordance with the provisions of the Act, plaintiffs' claim that the decision of the Governors of the Postal Service to adjust third class mailing rates must be invalidated for failure to comply with the requirements of the Postal Reorganization Act, is without merit. The Postal Reorganization Act directs that postage rates for each type of mail be set so that the rates generate sufficient revenue to cover the costs for carrying that type of mail. 39 U.S.C. §§ 101(d), 3622. The Governors of the Postal Service are charged with the establishment of fair and equitable classes of mail and postage rates and fees, 39 U.S.C. § 3621, but before instituting such rates the Postal Rate Commission normally must rule on the matters. 39 U.S.C. §§ 3622, 3623. In this instance the Governors of the Postal Service exercised their authority under 39 U.S.C. §§ 3621 and 3627 to adjust the rates to be charged to the affected mailers as required by the 1980 Act.

Characterization of the revocation of plaintiffs' reduced bulk mailing privileges as either a change in rates or a change in the classification requiring a recommended decision by the Postal Rate Commission would place the Commission in a position to veto an explicit Congressional mandate–or, at the very least, cause considerable delay in effectuating a statutory directive. Delaying the case to require a purely formal decision of the Commission would serve no purpose.

### C. Constitutional Questions

#### 1. *Due Process in Enactment*

Plaintiffs argue that they were deprived of due process of law because the 1980 Act violated House of Representatives Rule XXI(2) prohibiting the use of appropriations provisions to alter existing law–i. e., the 1978 Act. Without detailing the history, purpose and interpretation of this rule, see W.H. Brown, *Constitution, Jefferson's Manual and Rules of the House of Representatives*, H.R.Doc.No. 95–403, 95th Cong., 2d Sess., § 834 (1979); W. Keefe and M. Ogul, *The American Legislation Process*, 175 (4th ed. 1977), it is enough to say that a point of order was raised against the amendment on the ground that it violated the Rule, 125 Cong.Rec. H–5892 (1979), and the Chair summarily rejected the contention. *Id.* at H–5893.

■ Inherent institutional limitations on judicial power in our tripartite system of government preclude the courts from acting as arbiters of Congressional procedure. See *U. S. v. Ballin*, 144 U.S. 1, 12 S.Ct. 507, 36 L.Ed. 321 (1892); *Field v. Clark*, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892) (authentication of a bill by the officers of Congress is conclusive evidence of its due enactment). As the *Ballin* and *Clark* cases indicate, absent compelling constitutional interests, the judiciary accords "full faith and credit" to determinations by authorized officers of the House of Representatives that the rules of the House have been complied with.

■ The procedure followed by the House deprived no one of due process of law. No direct, personal and immediate interest in action taken by a Congressional Committee entitled plaintiffs to present their views. *Compare United States v. Yellin*, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963) (defendant's contempt of Congress conviction overturned on due process grounds because Congressional Committee violated its own rules in regard to executive sessions); *Christoffel v. United States*, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949) (defendant's conviction for perjury reversed

on grounds that in absence of a quorum, Congressional committee was not "duly constituted tribunal"). Due process rights to be heard do not attach to procedures resulting in the enactment of generally-applicable legislation. *Cf. Bragg v. Weaver*, 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135 (1919); *Bi-Metallic Investment Co. v. State Board of Equalization of Colorado*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915). As Justice Holmes, writing for the Court in *Bi-Metallic*, pointed out:

> Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

*Id.* at 445, 36 S.Ct. at 142. Though there may be strong policies against the use of appropriation riders to affect substantive rights, *see McRae v. Califano*, 491 F.Supp. 630, at 728 (E.D.N.Y.1980) (Dooling, J.); Democratic Study Committee, Special Report, *The Appropriation Rider Controversy*, 7–11 (February 14, 1978), the legislative procedure employed in the present instances was well within the power and prerogatives of Congress.

### 2. *First Amendment*

An essential element of the plaintiffs' claim is that by denying them the same discounted postal rates enjoyed by the major political parties Congress has restricted their access to the mails violating first amendment rights of expression and association. The present subsidy scheme, it is contended, violates the first amendment's instruction that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S.Const. Amend. 1.

▮ Government burdens speech either by 1) directly regulating the expression of ideas or information or 2) regulating noncommunicative activity in a way that restricts communication. Government activity of the first kind inhibiting communication is presumptively unconstitutional if it is based on the content of the ideas expressed. *See, e. g., Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972); L. Tribe, *American Constitutional Law*, 581–82 (1978). Government activity of the second kind is evaluated by balancing the governmental interest, such as preventing litter, with the harmful consequences to the particular form of expression, such as leafletting. *See, e. g., Koningsberg v. State Bar of California*, 366 U.S. 36, 50–51, 81 S.Ct. 997, 1007, 6 L.Ed.2d 105 (1961).

▮ Regulation of first amendment rights of expression must be content-neutral. The Supreme Court has often explained that " . . . above all else, the first amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 95–6, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

Mr. Justice Holmes eloquently explained the relation of access to the mails and the first amendment when he wrote: "The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues . . . ." *United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson*, 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704 (1921) (Holmes, J., dissenting and concurring with Brandeis, J., dissenting). *See also Rowan v. U. S. Post Office Dept.*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970) ("Without doubt the public postal system is an indispensible adjunct of every civilized society and communication is imperative to a healthy social order.").

Despite the obvious relationship between the right of expression and access to the mails, defendants contend that reduced postal rates to a favored few does not burden the plaintiffs' right of expression or block access to the mails but simply serves a legitimate governmental interest in facilitating the participation of the most important parties. Their chief reliance is upon the Supreme Court's rejection in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), of a first amendment challenge to the Campaign Fund Act. This precedent is not controlling.

In *Buckley* the Supreme Court, addressing a comprehensive statutory scheme that included expenditure, disclosure and contribution requirements, explained that the subsidy for presidential campaigns "is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process . . . ." 424 U.S. at 92–93, 96 S.Ct. at 670. The majority's view was that there is no restriction on the legislature's prerogative to provide financial assistance to the exercise of free speech. The distinction between a benefit and a burden was justified in *Buckley* because there was no evidence in the record that federal funds would enable any candidate to purchase scarce communication resources thereby effectively reducing the relative freedom of speech of a non-subsidized candidate. *See* L. Tribe, *American Constitutional Law*, 810 n. 3 (1978). In addition, because the subsidy in *Buckley* was for unspecified uses in a campaign, it was not necessarily the case that the denial of benefits would have an impact on the communication of a candidate's ideas. By contrast, the appropriation in the instant case is a direct subsidy of the mailing costs of selected parties. A denial of this subsidy is, unlike the result in *Buckley*, content-based censorship in violation of the first amendment.

Mr. Justice Brandeis, in a case involving the denial of discounted postal rates to a newspaper because of the views previously expressed in the paper, explained:

It is argued that, although a newspaper is barred from the second–class mail, liberty of circulation is not denied, because the first and third–class mail and also other means of transportation are left open to a publisher. Constitutional rights should not be frittered away by arguments so technical and unsubstantial.

\* \* \* \* \* \*

The government might, of course, decline altogether to distribute newspapers, or it might decline to carry any at less than the cost of the service, and it would not thereby abridge the freedom of the press, since to all papers other means of transportation would be left open. But to carry newspapers generally at a sixth of the cost of the service, and to deny that service to one paper of the same general character, because to the Postmaster General views thereon expressed in the past seem illegal, would prove an effective censorship and abridge seriously freedom of expression.

*United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson*, 255 U.S. 407, 431, 41 S.Ct. 352, 361, 65 L.Ed. 704 (1921) (Brandeis, J., dissenting).

It is arguable that a restriction based on nationwide popularity—as is the case with the 1980 Act—does not reflect a judgment regarding the content of the mail sent by "new" parties. But Justice Brandeis' admonition would not be less appropriate had the restriction to second class mail in the *Burleson* case been based on the circulation of the newspapers rather than on the views they expressed. It does not matter whether the impediment to free speech works its evil overtly or covertly. *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). Protection of unpopular ideas is the very essence of the first amendment. *See Troyer v. Town of Babylon*, 483 F.Supp. 1135 (E.D. N.Y.1980). To suggest that a regulation that confers benefits on the basis of popularity is not content-based would require the court to draw on artificial distinction between the popularity and the substance of an idea. The political positions of the

plaintiffs, in their view, are substantially different from those of the major parties. By subsidizing the mailings of the Republicans and Democrats, the government has chosen to benefit those with popular views and burden those with unpopular views. To handicap the mailing of campaign literature because a political party has not achieved a required level of acceptance is not different from censoring speech because of its substance. The denial of the postal discount is unacceptable for it "generates costs which burden the exercise of first amendment rights in direct proportion to the number of persons the speaker wants to reach." *Troyer v. Town of Babylon*, 483 F.Supp. 1135, 1139 (E.D.N.Y.1980), *citing Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (licensing); *Follett v. Town of McCormick, S. C.*, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 936 (1944) (fees).

■ The mails in general, and the discounted postal rates in particular, are public facilities designed to promote public communication. *See Rowan v. U. S. Post Office Dept.*, 397 U.S. 728, 735–36, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970). Access to a public forum for the expression and interaction of ideas is fundamental to a democracy. *See Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 473 (2d Cir. 1980).

■ While it is true that first amendment rights, though quite broad, may bow to other fundamental interests such as privacy, *see, e. g., Rowan v. U. S. Post Office Dept.*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970) (right to be left alone balanced with right to communicate), property, *see, e. g. Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), safety, *see, e. g., Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (speech creating "clear and present" danger unprotected), and national security, *see, e. g., Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), under appropriate circumstances, *see, generally*, L. Tribe, *American Constitutional Law* §§ 12–2 *et seq.* (1978); Frantz, The First Amendment in the Balance, 71 Yale L.J.

1424 (1962), the preservation of scarce financial resources has not provided a rationale for government activity that favors certain persons or groups and disfavors others on the basis of the content of the speech or the popularity of the speaker.

■ The fact that the government seeks to limit expenditures does not in this instance justify the denial of the constitutional right to express ideas different from that espoused by the majority. Austere fiscal periods necessarily force government to make difficult choices with respect to the services it provides. Difficult as they are, these decisions to restrict services cannot be made on the basis of the political views of the recipients of the service.

Defendants do not strengthen their position by analogizing to the electronic media cases and arguing that restriction of access is permissible when scarce resources are involved and that the fairness doctrine only requires a broadcaster to make a case–by–case "good faith judgment as to whether there can reasonably be said to be a need or interest in the community" to treat a minority party on an approximate parity with a major party. *Letter of Lawrence Smith*, 410 F.C.C. 549 (1963); *see also Dr. Benjamin Spock and the People's Party v. A.B.C., C.B.S., N.B.C.*, 44 F.C.C.2d 12, 20 (1973) (no showing that networks acted unreasonably or in other than good faith).

■ Characteristics of the electronic media have caused it to be viewed differently from other first amendment areas. *Compare Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) *with Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). But the analogy fails here for a number of reasons. First, the "equal time rule," 47 U.S.C. § 315(a), and the fairness doctrine, *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), limit the power of *private* broadcasters to restrict access to the airwaves. Second, the equal time rule governs access by candidates not by their supporters. *Felix v. Westinghouse*

*Radio Stations, Inc.,* 186 F.2d 1 (3d Cir. 1930); *Nicholas Zapple,* 23 F.C.C.2d 707 (1970). Third, private broadcasters retain a degree of first amendment freedom to discriminate that the government does not possess. The meticulous neutrality required of government is not demanded of private broadcasters save for the extraordinary circumstances where the "equal time" provisions are applicable. In the ordinary course of its news coverage, a private broadcaster's obligation of neutrality is governed by the "fairness doctrine." And the "fairness doctrine" represents an attempt to confer upon the broadcast licensee the widest possible first amendment latitude consistent with a licensee's responsibility, given the limited number of stations that can broadcast without interfering with each other.

 Government cannot adopt a policy of granting broadcast licenses only to Republicans and Democrats and denying them to others. *Sée Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage, Co.,* 289 U.S. 266, 281–84, 53 S.Ct. 627, 634–35, 77 L.Ed. 1166 (1933) (licenses must not be allocated arbitrarily or capriciously). Nor could the government require licensees to deny access to persons not affiliated with the "major" parties or to favor certain views by granting them reduced payments or special discounts. *See Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 128–32, 93 S.Ct. 2080, 2099–2101, 36 L.Ed.2d 772 (1973).

 Recent public forum cases, though approaching the problem of equal access as an aspect of equal protection, have very significant first amendment implications. *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Perry, Modern Equal Protection: A Conceptualization and Appraisal, 79 Colum.L.Rev. 1023, 1076 (1979) (to void the city ordinance banning picketing "[r]eference to equal protection was unnecessary; the first amendment was entirely adequate to the occasion."). *See* discussion, II C3, *infra.* These cases do not suggest that content neutrality is unnecessary if there exists a sufficient governmental interest. Rather, classification of an activity, facility, place or service as a "public forum" requires that government regulation must be *both* content–neutral and narrowly drawn so as to serve significant governmental interests. *See, e.g., Grayned v. City of Rockford,* 408 U.S. 104, 116–117, 92 S.Ct. 2294, 2303–04, 33 L.Ed.2d 222 (1972). *See generally,* L. Tribe, *American Constitutional Law* 690 (1978); Kalven, the Concept of the Public Forum: *Cox v. Louisiana,* 1965 S.Ct.Rev. 1, 29–30. It is only "once the restrictions are found to be content–neutral, and it is determined that alternative avenues of communication are available" that the question becomes one of balancing the first amendment rights with the governmental interests. *See Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 473 (2d Cir. 1980).

 In the public forum cases the rule adopted by the Court is that public areas, activities or services established by government to serve the purpose of enhancing free expression must be available to all ideas. *See, e.g., Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Southeastern Promotions v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). When government undertakes to encourage public communications, whether the undertaking is accomplished by subsidizing a park, a civic auditorium or a postal system, it cannot discriminate in permitting access to the facility on the basis of the content of the communication or the popularity of the speaker. There is an "equality of status in the field of ideas." A. Meiklejohn, *Political Freedoms: The Constitutional Powers of the People* 27 (1948). Public fora can only be regulated as to "time, place, or manner," of the expression. *Cox v. New Hampshire,* 312 U.S. 569, 575–76, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). Defendants' assertion that it is attempting to "enhance the ability of certain parties to communicate with the public," *see* Defendants' Second Supplemental Memorandum at p. 4, does not alter its obligation to remain neutral, providing all citizens with an equal opportunity to communicate.

"Each medium of expression . . . must be assessed for first amendment purposes by standards suited to it, for each may present its own problems. . . ." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975). The mails have a distinguished and protected history as a vehicle for the communication of political ideas. Their monopolistic nature requires that any restriction and especially a restriction that at best touches, and at worst obstructs, the expression of political ideas must be viewed with great suspicion. A regulation that prohibited access by third political parties to the mails would be intolerable. To suggest that the benefit granted the major parties is acceptable because it only creates a relative impediment to "new" parties ignores the reality that in a competitive intellectual environment assistance to one competitor is necessarily a relative burden to the other. *See* L. Tribe, *American Constitutional Law* (1978); The Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 185–86 (1976). The 1980 Act creates a burden on access to precious mail services for some kinds of ideas and it is a constitutionally impermissible restriction on the first amendment rights of "new" parties.

### 3. *Equal Protection*

States are prohibited from denying any person the equal protection of the laws. U.S.Const. Amend. XIV, § 1. The due process clause of the fifth amendment makes the federal government subject to the same instruction. *See Weinberger v. Wisenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975). "Equal protection analysis in the fifth amendment area is the same as that under the fourteenth amendment." *Buckley v. Valeo*, 424 U.S. 1, 93–94, 96 S.Ct. 612, 670–671, 46 L.Ed.2d 659 (1976).

Laws that affect a fundamental right, *see, e.g., Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (right to interstate travel), are to be examined with strict scrutiny by the court. In order to satisfy such an examination the law or regulation must be a neces-

sary element for achieving a compelling governmental interest. To be viewed as necessary, the classification or infringement must be the least burdensome means available for attaining the governmental objective. *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972).

#### a. Fundamental Rights

The denial of the preferred postal rates has a direct effect upon the plaintiffs' access to the mails. In turn, because of the close relationship of the mails and political expression, the ability of the plaintiffs to communicate is seriously impaired and their first amendment right of expression is jeopardized. *See* discussion, *supra*. In addition, the plaintiffs' right of association is attenuated by the 1980 Act. *See N.A.A.C.P. v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Emerson, Freedom of Association and Freedom of Expression, 74 Yale L.Rev. 1 (1964). Finally, the viability of the candidacies of the representatives of the plaintiff political parties is challenged by the postal rate appropriations. Sims, Discrimination in State Election Laws Against Third Party and Independent Candidates, 6 Colum. Human Rights L.Rev. 155, 165–66 (1974).

Any regulation that limits or enhances a political party's access to the mails necessarily affects the ability of that party to express its views, solicit funds, and recruit new members. The realities of the process for building financial and popular support for a political party, the integral role played by mailings, and the extremely tight budgetary constraints under which most third and independent parties operate all mitigate against the proposition that the government could facilitate access for one political party and not necessarily burden all other parties that are in competition with the benefitted party. *See Stanson v. Mott*, 17 Cal.3d 206, 551 P.2d 1, 9, 130 Cal.Rptr. 697, 705 (1976) ("selective use of public funds in election campaigns . . . raises the specter . . . [of] improper distortion of the democratic electoral process."). *See also* the Supreme Court, 1975

Term, 90 Harv.L.Rev. 56, 186–87 (1976) (the distinction between suppressing political splinter groups and simply not encouraging them is illusory "because the strength of political parties is important only in a relative sense. Those parties compete for a limited electorate, so support for selected parties necessarily weakens their opponents."); Developments in the Law–Elections, 88 Harv.L.Rev. 1111, 1268 (". . . any system that funds only some candidates on the ballot places their competitors at a clear disadvantage.").

■ Interference with a political party's utilization of the mails is a direct infringement on the ability of that party to express its views which is, in turn, interference with the ability of members and potential members to enjoy political associations of their choosing. The 1980 Act adversely affects fundamental interests.

Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations. Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups.

*Sweezy v. New Hampshire*, 354 U.S. 234, 250–251, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957) (plurality opinion).

b. Non–speculative Harm

In upholding the provisions for public financing of presidential election campaigns against equal protection challenges, the Supreme Court, in *Buckley v. Valeo*, 424 U.S. 1, 94, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976), explained that there was no showing that the election funding plan would necessarily decrease the funds available to unqualified parties and "any risk of harm to minority interests is speculative due to our present lack of knowledge of the practical effects of public financing . . . ." 424 U.S. at 100–101, 96 S.Ct. at 673–674. The requirement that those accepting public financing voluntarily accept expenditure ceilings suggested to the *Buckley* court that "[a]s a practical matter . . . [the Campaign Fund Act] does not enhance the major parties' ability to campaign; it substitutes public funding for what the parties would raise privately and additionally imposes an expenditure limit." *Buckley v. Valeo*, 424 U.S. 1, 95 n. 129, 96 S.Ct. 612, 671 n. 129, 46 L.Ed.2d 659 (1976). The court also suggested that " . . . expenditure limits for major parties and candidates may well improve the chances of nonmajor parties and their candidates to receive funds and increase their spending." 424 U.S. at 101, 96 S.Ct. at 674.

■ In contrast, the receipt of the discounted postal rates is not conditioned on any sacrifice regarding receipt or expenditure of private funds. There is no possibility that the discount can, in any way, act to the advantage of the non–qualifying parties. Harm caused by the 1980 Act is substantial and clear.

c. Governmental Interests

■ Recognizing that governmental regulations that impinge on fundamental interests can be sustained only if they further a "vital" governmental interest, *American Party of Texas v. White*, 415 U.S. 767, 780–781, 94 S.Ct. 1296, 1305–1306, 39 L.Ed.2d 744 (1974), the defendants contend that the discount provision facilitates public expression, *see Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), preserves scarce resources, *cf. Red Lion Broadcasting v. F.C.C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (scarce technology justifies government regulation of broadcast media), insures a manageable election process, *see Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); and protects against factionalism, *see Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974), *cf.*

*Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (Powell, J., dissenting) (patronage justified because of its effect on two–party system).

(1) Facilitating Public Expression.

There can be little doubt that the postal subsidiary was designed, in part, to facilitate access to the mails for the Democratic and Republican parties. In turn, there is little question that increased access serves to enhance public communication and debate. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court emphasized that the Campaign Fund Act advanced substantial governmental interests facilitating political debate by minimizing the political influence of "big money" and by avoiding the subsidization of "hopeless" candidates. 424 U.S. at 96, 96 S.Ct. at 671. The 1980 Act serves neither of these interests.

Focusing on the influence of "big money," *see* discussion of funding factions, *infra*, the 1980 Act enhances rather than diminishes, the power of wealth in the electoral process. In addition, the 1980 Act carries no *quid pro quo* from recipients of the special rate. Recipients face neither special disclosure requirements nor the limitation on campaign expenditures or campaign contributions that were part of the statutory scheme addressed in *Buckley*.

At the same time, the 1980 Act imposes a higher rate upon those most in need of access to private funds-those excluded by the same definition of qualified political committee here at issue, from public funds accessible through the Campaign Fund Act. Accordingly, the 1980 Act exacerbates the very problem of the impact of wealth on the political process that the Campaign Fund Act arguably sought to relieve.

The question is not whether the government has a vital interest in facilitating political discussion–as to this there is no debate. Rather, the problem is whether government has a vital interest in restricting the political expression of some third and independent parties. Although it is arguable that the government may have an interest in restricting access as a means of achieving other objectives, such as insuring the integrity of the system or protecting scarce resources, *see* discussion, *infra*, restricting access to the minds of the public in and for itself cannot be an acceptable goal of governmental regulation. Looking at both the benefits and the burdens of the discounted postal rates, the product is not the facilitation of political communication but its suppression. *See* Comment, *Buckley v. Valeo* : The Supreme Court and Federal Campaign Reform, 76 Colum.L.Rev. 852, 889 (1976).

(2) Integrity of Elections.

In order to minimize confusion and obtain a fair picture of the wishes of the electorate, government may legitimately prescribe qualifications for access to the ballot that are designed to insure that an independent or third party candidate is "a serious contender, truly independent, and with a satisfactory level of community support." *Storer v. Brown*, 415 U.S. 724, 746, 94 S.Ct. 1274, 1286–87, 39 L.Ed.2d 714 (1974) (footnote omitted).

There is no need, however, to restrict access to the mails to insure manageability and integrity of elections. In fact, because the political marketplace is flexible and benefits from the continual influx of new ideas, any regulation that discourages or prevents access to the potential voter, does not protect but challenges the integrity of the political process. *Cf. Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806–07, 23 L.Ed.2d 371 (1969) ("[i]t is the purpose of the first amendment to preserve the uninhibited marketplace of ideas in which truth will ultimately prevail, rather than countenance monopolization of that market . . . .").

(3) Protecting Scarce Fiscal Resources.

All cases in which government protects and fosters free expression by providing public fora or services involve the expenditure of "scarce" financial resources. L. Tribe, *American Constitutional Law* 689–

90 (1976) (public fora "cannot be put off limits to leafletting, parading, or other first amendment activities merely to spare public expense or inconvenience. . . ."). If money to subsidize political mailing is limited, the degree of subsidy to the two major parties can readily be reduced so that all political mailings are charged equally. No technological or space limitations prevent full equality.

#### (4) Protecting against factionalism.

As already noted, factionalism has been a fear of the incumbent parties or powers since the earliest days of the Republic. The interest in minimizing the threat finds recent support in Supreme Court opinions in ballot access cases, see *Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974), campaign funding cases, see *Buckley v. Valeo*, 424 U.S. 1, 96, 96 S.Ct. 612, 671, 46 L.Ed.2d 659 (1976), and political patronage cases, see *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (March 31, 1980) (Powell, J. dissenting). The Court has apparently sanctioned as a state interest the limited promotion of the two–party system and has reduced its criticism of governmental schemes insulating two particular parties from the effective challenges of other candidates. L. Tribe, *American Constitutional Law* 88 (1979).

■ The language of the cases reveals however, that the state interest is to avoid providing "artificial incentives to 'splintered parties and unrestrained factionalism.'" *Buckley v. Valeo*, 424 U.S. 1, 96, 96 S.Ct. 612, 671, 46 L.Ed.2d 659 (1976), *quoting Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974). This language is often coupled with discussions of the government's interest in preserving public money, see *Buckley v. Valeo*, 424 U.S. 1, 96, 96 S.Ct. 612, 671, 46 L.Ed.2d 659 (1976), or guaranteeing manageable political processes, see *Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974). Limiting excess factionalism as a means of attaining other goals is arguably legitimate. *See* discussion, *supra*. There is no suggestion, however, that entrenchment of the present two parties by stifling the speech of competitors is a legitimate interest of government. While Congress may choose not to offer any incentives or assistance to new parties or independent candidates, it may not act to create disincentives for the purpose of protecting the two parties which now share control of the government.

#### d. *Balancing*

■ The interests purportedly protected by the provisions of the 1980 Act do not survive impartial scrutiny and weighing. Any standard that causes funds to be allocated to some candidates or parties and not to others is inherently suspect because it serves the self-interests of those responsible for establishing the standard. *See* Developments in the Law—Elections, 88 Harv.L. Rev. 1111, 1268 (1975). In addition, even if the legislature attempts to act with "enlightened" self-interest, the risk remains that unrepresented interests—those of third parties or independent candidates—will be ignored. *See* Ely, The Wages of Crying Wolf: A Comment on *Roe v. Wade*, 82 Yale L.J. 920, 933 n. 85 (1973).

■ Federal judges, by arrangement of the Founding Fathers, sit in the enviable position of being free from the need to engage in election campaigns. This immunity from the very real antagonisms that exist among the major parties and third parties and independent candidates carries the obligation that the court look at any Congressional resolution of this conflict with skepticism. *See* Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 186 (1976). Even if the Court were to strike a more deferential posture, the interests protected by the 1980 Act are neither compelling nor persuasive.

### III. *INDEPENDENT CANDIDATES*

As defined in the 1978 Act, "qualified political committee[s]" entitled to receive the special rate are defined as the "national" and "state committee[s]" of a "political party." 39 U.S.C. § 3626(e). The terms "national" and "state committee[s]" mean

782

"the organization[s] which, by virtue of the bylaws of a political party, [are] responsible for the day–to–day operation of such a political party" at the national and state levels, respectively. 39 U.S.C. § 3626(e). Unfortunately, the term "political party" is undefined in the 1978 or 1980 Acts.

As already noted, entities that are today called "political parties" are relatively new. The word party itself has had an evolving definition, see discussion, supra. American political leaders in the late eighteenth and early nineteenth centuries apparently used the concept of a party to categorize a "current of political opinion rather than an organized institution." R.A. Dahl, *Pluralist Democracy in the United States* 207 (1967).

Although the 1978 and 1980 Acts fail to define "political party," other statutes do offer some assistance by including an association, committee or organization collecting or using money for the purpose of nominating and electing candidates.

The Tax Code defines a political party for purposes of dealing with debts owed by such an entity as:

(A) a political party;

(B) a national, state or local committee of a political party; or

(C) a committee, association, or organization which accepts contributions or makes expenditures for the purpose of influencing or attempting to influence the election of presidential or vice–presidential electors or of any individual whose name is presented for election to any federal, state or local elective public office, whether or not such individual is elected.

Internal Revenue Code, § 271(b) (1980). *See Stern v. United States,* 304 F.Supp. 376, 379 (E.D.La.1969), *aff'd* 436 F.2d 1327 (5th Cir. 1971). And the Federal Election Campaign Act, 2 U.S.C. § 431(16) (which differs from what we have referred to as the "Campaign Fund Act," known as the "Presidential Election Campaign Fund Act [26 U.S.C. § 9002]) provides for purposes of regulating contributions and expenditures in all federal election campaigns:

(16) The term 'political party' means an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of any such association, committee, or organization.

*See also, e. g.,* cases defining political parties for Hatch Act purposes: *Jarvis v. U. S. Civ. Serv. Comm.,* 382 F.2d 339 (6th Cir. 1967); *Joseph v. U. S. Civ. Serv. Comm.,* 554 F.2d 1140, 1147 n. 3 (D.C.Cir.1977) (defining independent candidate).

Finally, a standard dictionary defines party as:

1. a group of people working together to establish, promote, or gain acceptance for, some kind of government, cause, or theory which they hold in common; especially, an organized political group which tries to elect its candidates to office.

Webster's New World Dictionary, College Edition (1966). *See also* to the same effect, *e. g.,* Webster's Third New International Dictionary (1967); The Compact Edition of the Oxford English Dictionary (1971); The New Columbia Encyclopedia 2076, 2077 (1975).

■ From these definitions, a functional characterization of political party for the purpose of this case can be derived focusing on four characteristics: 1) a common political purpose, 2) of an organized group, 3) designed to increase political power, as by electing candidates congenial to its views, with 4) some degree of permanence. The point at which individual opposition to incumbent parties or candidates becomes institutionalized opposition is the point at which a political party is created.

A. Barry Commoner.

The Citizens' Party derived from the Citizen's Committee which was established in April 1979. It seeks to attain the status of an "authorized committee," "new party" or "political committee" of an "eligible candidate" under the Campaign Fund Act. 26 U.S.C. § 9002(1), (2), (4), (8), (9). To do so it has to nominate a candidate for President whose name will appear in "ten or more

States." 26 U.S.C. § 9002(2). *Cf.* 2 U.S.C. § 431(16) ("political party" apparently requires a nomination for federal office in only one state). Barry Commoner and La Donna Harris were nominated at a National Convention on April 13, 1980, to represent the Party as Presidential and Vice-Presidential candidates, respectively. Having apparently satisfied ballot requirements in a number of states, the Citizens' Party has allegedly achieved political party status pursuant to the Federal Election Campaign Act, 2 U.S.C. § 431(16), and plans to qualify under the Campaign Fund Act, 26 U.S.C. § 9002. Thus, the Citizens' Party, upon application, would, absent some unforeseen problem, qualify for the special postal rate provided for in the 1978 Act. The limitation of the 1980 Act requiring a five percent showing in the prior presidential election denies such a newly created party the benefits enjoyed by major and minor parties. Unlike the Campaign Fund Act, 26 U.S.C. §§ 9001 *et seq.*, the 1978 and 1980 Acts make no provision for reimbursement based on the returns in the present presidential election.

B. John Anderson.

John Anderson's National Unity Campaign sought to avoid categorizing itself as a new third party. *See* Transcript of Hearing at 31, June 6, 1980. Rather, it hopes to channel opposition to the present major parties into the candidacy of Representative Anderson. Despite the formal distinction, the National Unity Campaign apparently remains subject to the Federal tax laws regulating political parties (Internal Rev. Code § 271(b) [1980]), to the Federal Election Campaign Act of 1971 as amended (2 U.S.C. §§ 431 et seq.) and to the Campaign Fund Act. 26 U.S.C. §§ 9001 *et seq.*

The only difference between the Unity Campaign and the other new political parties is, perhaps, the intention to be or become a permanent institution. All the other functional characteristics of a political party are satisfied by the Unity Campaign.

The legislative history is quite sparse regarding the 1978 Act. As an amendment to the Overseas Citizens Voting Rights Act, the extension of the special third rate postal rates to qualified political committees received little attention. *See* 123 Cong.Rec. S–7238 (1977) and 124 Cong.Rec. H–10706 (1978). There is no evidence in the statutory history indicating that permanence was a concern of the legislators. If any intent is to be derived from subsequent Congressional activity, it is that the Legislature wished to avoid funding unpopular parties or candidates, *see* discussion of Congressional debates, *supra*, and seized on the notion of national impact as a tool for restricting the subsidy scheme.

The present potential national impact of John Anderson is at least as great as that of the candidates of any of the small political parties that defendant concedes are qualified under the 1978 Act. A Yankelovich Skelly and White poll published in *Time Magazine* on June 2, 1980, indicated that Representative Anderson was then the choice of 23 percent of those polled.

Given the breadth and ambiguity of the "party" concept and the functional equivalence of the Unity Campaign with other national political "parties," there is every reason to treat the Unity Campaign as a political party for purposes of the 1978 Act. The Supreme Court has repeatedly emphasized the duty of the federal courts to construe federal statutes with a view to their constitutionality, even at the risk of some strain upon the ordinary meaning of words. *Ashwander v. TVA*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). The first and fifth amendment principles that render the 1980 Act unconstitutional also foreclose a narrow reading of the 1978 Act.

In interpreting a similar provision in the Campaign Fund Act, the Supreme Court indicated that the statute should be construed to obviate constitutional difficulties. On their face, the provisions of the Campaign Fund Act extend federal funding only to candidates of "parties." *See* 26 U.S.C. § 9002(6), (7), (8). This term has been held to include groups supporting individual candidacies. *Buckley v. Valeo*, 519

F.2d 821 (D.C.Cir.1975), *aff'd in part,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Court of Appeals for the District of Columbia noted:

> [I]f these provisions would in fact operate to prevent independents from obtaining public funding, no matter what their showing, or if they would require that independents go to the trouble of creating elaborate party machinery in order to obtain public funding, then they would raise serious constitutional questions.

*Buckley v. Valeo,* 519 F.2d 821, 887 (1975), *citing Storer v. Brown,* 415 U.S. 724, 745–46, 94 S.Ct. 1274, 1286–1287, 39 L.Ed.2d 714 (1974). The Court of Appeals declared that the statute:

> does not command that interpretation. The term "political party" is not defined in the public financing provisions. There is thus ample room for the Commission or the officials in charge of disbursing funds to find that even informal committees formed to support independent candidates for President constitute parties for the purpose of [the statute].

519 F.2d at 887. Although the Supreme Court had no occasion to decide the question in *Buckley,* it repeated the suggestion of the Court of Appeals, indicating that the statute might be unconstitutional if construed to deny benefits to candidates "solely because" they lacked affiliation with a "political party." *Buckley v. Valeo,* 424 U.S. 1, 87 n. 118, 96 S.Ct. 612, 667 n. 118, 46 L.Ed.2d 659 (1976).

The National Unity Campaign represents a political organization with some national support and common purpose designed to foster the election of John Anderson to the Presidency of the United States. It qualifies as a "political party" for purposes of the 1978 Act.

## IV. *REMEDY*

Plaintiffs seek an order directing the Postal Service to make available to them the same reduced mailing rates as that enjoyed by the Democratic and Republican parties. Defendants, by contrast, suggest that if the 1980 Act is declared unconstitutional, nullification of the 1978 and 1980 Acts rather than extension of the special rates is the preferred result. While the matter is far from clear, the former remedy is more appropriate to the circumstances of the present case. No other available remedy could afford timely redress to the plaintiffs, cure the constitutional defect in the 1980 Act, and carry out Congressional intent reflected in both the 1978 and 1980 Acts of facilitating political communication with the electorate through the mails. Total invalidation of the appropriation implementing the 1980 Act would be a costly victory; plaintiffs would still stand deprived of their badly–needed mailing subsidy and the general flow of political information would be obstructed.

By excluding "new" parties from the appropriation covering reduced mailing rates for qualified political parties, Congress has not merely declined to appropriate funds for reduced mailing rates for new parties, but has expressly directed that no funds be spent for that purpose. A judicial order requiring that funds be spent for new parties arguably amounts to the making of a new appropriation, a power reserved to Congress. U.S.Const. art. I, § 9, cl. 7. Because of the express Congressional prohibition, such an order might be construed to constitute judicial usurpation of the appropriation power, whether or not a new appropriation of funds was actually required. As Justice Harlan wrote:

> Where a statute is defective because of underinclusion there exist two remedial alternatives: a court may either declare it a nullity and order that the benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion.

*Welsh v. United States,* 398 U.S. 333, 361, 90 S.Ct. 1792, 1807–08, 26 L.Ed.2d 308 (1970) (concurring opinion).

The federal courts have been divided on this issue in connection with suits seeking invalidation of the Hyde Amendment, a provision which excluded coverage for elective abortions from an appropriation for

Medicaid reimbursements provided for in Title XIX of the Social Security Act. *Compare Doe v. Mathews*, 420 F.Supp. 865, 870 (D.N.J.1976) (either a declaratory judgment that the Hyde Amendment was unconstitutional or an order enjoining its enforcement would be "futile and meaningless"), *with McRae v. Mathews*, 421 F.Supp. 533 (E.D.N.Y.1976), *vacated and remanded sub nom. Califano v. McRae*, 433 U.S. 916, 97 S.Ct. 2993, 53 L.Ed.2d 1103 (1977) (remand for reconsideration of constitutional merits, implying that the Supreme Court did not find the direction for reimbursement to be clearly unconstitutional).

■ Relevant Supreme Court decisions support the view taken in *McRae* that clause 7 of section 9 of Article I of the Constitution does not bar affirmative injunctive relief against the government, even where such relief would entail new appropriations or expenditures of funds. *Califano v. Wescott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979); *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). In *Lovett*, the Supreme Court affirmed a judgment of the Court of Claims invalidating, as a bill of attainder, an amendment to a Treasury–Post Office Department appropriations bill prohibiting the expenditure of appropriated funds for the salaries of certain named federal employees. The Court recognized that "no mere question of compensation procedure or of appropriations was involved." 328 U.S. at 313, 66 S.Ct. at 1078. Rather, the Court applied *United States v. Dickerson*, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940), in holding that the amendment was amenable to judicial review because it, in effect, constituted a statute denying the plaintiffs the right to employment by the federal government. 328 U.S. at 314, 66 S.Ct. at 1078.

■ The Supreme Court's recent decision in *Califano v. Wescott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979), also suggests that there is no constitutional bar to court–ordered expenditures of available federal funds. *Wescott* affirmed a district court decision invalidating a gender–based discrimination in the Social Security Act

and ordering payment of welfare benefits to families that had been excluded by the statute. The Court found that the power to order extension of the benefits was not clearly beyond the constitutional competence of a federal district court. 443 U.S. at 90, 99 S.Ct. at 2664. In this connection, the Court pointed to the hardship that invalidation would cause to persons Congress clearly intended to benefit. 443 U.S. at 90, 99 S.Ct. at 2664. It noted that it has frequently affirmed decisions directing payment of welfare benefits to unconstitutionally excluded classes. *See, e.g., Califano v. Goldfarb*, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977), *aff'g* 396 F.Supp. 308, 309 (E.D.N.Y.1975); *Califano v. Silbowitz*, 430 U.S. 924, 97 S.Ct. 1539, 51 L.Ed.2d 768 (1977), *summarily aff'g* 397 F.Supp. 862, 871 (S.D.Fla.1975). Lack of a severability clause in the 1980 Act is not decisive in view of the strong policy reflected in the 1978 Act favoring subvention of political discourse through the mails. *Cf. Califano v. Wescott*, 443 U.S. 76, 90, 99 S.Ct. 2655, 2664, 61 L.Ed.2d 382 (1979).

It is significant that the dissent in *Wescott* did not challenge the constitutional power of the district court to direct payment of welfare benefits. 443 U.S. at 93–94, 99 S.Ct. at 2665 (Powell, J., dissenting). The dissent argued that since the intent of Congress was not clear as to the choice between extension and invalidation, the Court should have left to Congress the task of rewriting the unconstitutional legislation.

■ The considerations underlying the decisions in *Wescott*, *Lovett* and *McRae* to order expenditures of federal funds already appropriated are directly applicable in the present case. The funds that would be necessary to provide reduced mailing rates for "new" parties are a minute portion of the total appropriation implementing the 1980 Act. Thus, an order directing that reduced mailing rates be made available to "new" parties would relate to the use of concurrently appropriated funds and would not constitute a new appropriation. *See McRae v. Califano*, 491 F.Supp. 630, at 728

(E.D.N.Y. Jan. 15, 1980); *McRae v. Mathews*, 421 F.Supp. 533, 540–541 (E.D.N.Y. 1976), *vacated and remanded sub nom. Califano v. McRae*, 433 U.S. 916, 97 S.Ct. 2993, 53 L.Ed.2d 1103 (1977). The 1980 Act operates primarily as legislation since it deprives the new parties of statutory rights created by the 1978 Act. *See United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1940); *McRae v. Califano*, 491 F.Supp. 630 at 728, 729 (E.D.N.Y.1980). The "equitable considerations" relied on in *Califano v. Wescott*, 443 U.S. 76, 90, 99 S.Ct. 2655, 2664, 61 L.Ed.2d 382 (1979), also dictate extension rather than invalidation in the present case. Only an order directing that preferred mailing rates be made available to "new" parties immediately would permit them to use their mailing privileges effectively in the current election. Invalidation, on the other hand, would irretrievably frustrate political communication through the post by all parties.

Finally, the defendants themselves concede that "it is entirely possible that the $4 million included in the Appropriation Act to implement political mailings at special rates will suffice to extend the currently effective rates to all political committees for the remainder of the fiscal year 1980." Defendants' Second Supplemental Memorandum of Law at 16. If there are insufficient funds, a slight upward adjustment of the postal rate will permit full compliance with the Constitution. 39 U.S.C. § 3627.

The Postal Service is directed to charge plaintiffs and plaintiffs–intervenors the same postage rates as are paid by committees of major parties, using funds appropriated for fiscal year 1980.

SO ORDERED.