Marian **SPENCER, et al., Plaintiffs,**

v.

Robert L. **HERDESTY, et al.,**
**Defendants.**

**No. C-1-83-1349.**

United States District Court,
S.D. Ohio, W.D.

Sept. 22, 1983.

---

W. Joseph Dehner, Jr., Cincinnati, Ohio, for plaintiffs.

Elizabeth Gere Whitaker, Asst. U.S. Atty., Cincinnati, Ohio, Arthur R. Goldberg, Civil Div., Dept. of Justice, Washington, D.C., for defendants.

### OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PRE-LIMINARY INJUNCTION

SPIEGEL, District Judge:

This matter came before the Court on a hearing for a preliminary injunction (doc. 1), defendants' memorandum in opposition (doc. 4), and plaintiffs' reply (doc. 8). In addition, the parties submitted stipulations of fact (doc. 7). Also before the Court are exhibits admitted by the Court.

Our review of the pleadings, arguments of counsel, and the evidence persuades us that plaintiffs have demonstrated that they are entitled to preliminary injunctive relief. Accordingly, we order defendants to make available to the Charter Committee of

Greater Cincinnati the same special third-class rate available to Republican and Democratic State Committees for bulk mailings of campaign material. This Order is conditional upon plaintiffs' posting security with the Court in the amount of $3,700; security may be in the form of personal guarantees. Rule 65(c), Fed.R.Civ.P.

I

The Charter Committee of Greater Cincinnati (Charter) and four candidates nominated by Charter for the upcoming Cincinnati City Council election brought this action for a mandatory injunction directing the United States Postal Service (Postal Service) to allow Charter to mail its campaign literature at the special third-class bulk rate available to state and national political parties pursuant to 39 U.S.C. § 3626(e). Charter, founded in 1924 as a reform party, is an association of citizens of Greater Cincinnati whose purpose is to encourage better local government. It expressly eschews affiliation with any state or national political organization. Furthermore, it declines to become a state organization on the ground that such a development would be contrary to its underlying principles and exclusive focus on local government.

In the 1983 race for nine seats on Cincinnati City Council, the four Charter candidates are competing against five candidates nominated by the local Democratic party and nine candidates nominated by the local Republican party. In addition, Charter has endorsed two candidates for Hamilton County Municipal Court, one of whom was nominated by the Republican party and the other by the Democratic party. The election is scheduled for November 8, 1983.

Section 3626(e) permits state committees of political parties the right to mail material at a special bulk third-class rate currently set at $.052 per piece. The Ohio Democratic Party and the Ohio Republican Party are qualified state committees permitted to mail at this special rate.

On June 24, 1983, Charter applied for the special bulk third-class rate. The Postal Service rejected the application by letter dated July 11, 1983, on the grounds that Charter did not qualify as a political committee under § 623.3 of the Domestic Mail Manual. The Postal Service referred to Charter's purposes as stated in the Charter constitution, concluding that Charter was a civic organization and, therefore, not eligible for the special third-class rate. In response to a July 20, 1983 letter from Charter to the Postal Service seeking clarification of the earlier decision, the Postal Service stated in a letter dated August 5, 1983, that § 623.32 of the Domestic Mail Manual defined qualified political committees eligible for the special rate. The Postal Service further pointed out that § 623.4 included civic improvement associations and political organizations other than those enumerated in the statute as organizations ineligible for the special rate. Charter did not appeal the denial of its application to the appropriate Postal Service authorities.

During the 1981 Cincinnati City Council election, Charter mailed campaign literature at the regular third-class bulk rate of $.11 per piece. In March 1983, Charter sent a bulk mailing of its newsletter at this same rate. It mailed another newsletter on August 29, 1983 at the same bulk rate. If it had been permitted to mail the August 1983 newsletter at the special rate, Charter would have saved $162.46.

Peter Strauss, a Cincinnati City Councilman, testified that he ran as a Democrat in the 1981 election for Council. Admitted as plaintiffs' exhibit 3 is a campaign postcard urging voters to support Strauss in the 1981 election. The postcard states on the address side that it was "issued by: Ohio Democratic Party" and that it was mailed pursuant to a permit held by a non-profit organization[1]. Councilman Strauss testified that the postcard was prepared and printed by his campaign staff, but that it

---

1. Qualified non-profit organizations are also qualified for the special bulk class mailing rate.

39 U.S.C. § 3626(e).

was mailed by the Ohio Democratic party in Columbus pursuant to its special third-class permit. He further testified that his campaign committee reimbursed the Democratic State Party for the cost of mailing approximately 50,000 postcards to Cincinnati residents [2].

William Hamilton, Executive Director of Charter, testified that Charter plans a mailing for October 14, 1983 to promote its candidates. Hamilton stated that Charter's budget would allow mailing only 2,800 pieces at the regular third-class rate, but that if the $.052 rate available to state committees were available to Charter, Charter would mail an additional 2,700 pieces.

Hamilton also testified that the four Charter candidates have requested that Charter mail their campaign material. Based upon a projected mailing of 58,000 pieces, the availability of the special rate would release $3,400 for other campaign purposes. Hamilton testified that $3,400 is a significant amount in the context of the Cincinnati Council election and that targeted bulk mailings are the most important element in local elections. On cross-examination, Hamilton explained that any mailings done by Charter for a candidate would be financed out of the candidate's campaign treasury. In addition, he stated that each candidate would be responsible for preparing his or her own mailing, explaining that the candidates are not controlled by Charter.

## II

The standard in this Circuit for issuing a preliminary injunction is well-established.

In determining whether to exercise its discretion to grant preliminary injunctive relief, the District Court must consider four factors:

1) Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiff has shown irreparable injury;

3) Whether the issuance of the preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction.

*Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir.1982), quoting *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (6th Cir.1971). Although these four factors do not establish a rigid test for the granting of injunctive relief, all four must be addressed. *Id.*

## III

■ The statute challenged by plaintiffs provides:

(e)(1) ... the rates for third-class mail matter mailed by a qualified political committee shall be the rates currently in effect ... for third-class mail matter mailed by a qualified nonprofit organization.

(2) For purposes of this subsection—

(A) the term "qualified political committee" means a national or state committee of a political party, the Republican and Democratic Senatorial Cam-

---

**2.** At the hearing, counsel for defendants argued that if, in fact, Republican and Democratic candidates for City Council were mailing under the permit of their state parties, they were violating Postal Regulations. Section 623.51 of the Domestic Relations Manual states that an organization authorized to mail at the special rates "may mail *only* its own matter at those rates" and may not delegate or lend the use of its permit to any other person or organization (emphasis original). Counsel also cited regulations stating what may not be mailed under a special third-class permit as authority for defendants' position that the special rate is not

available for any mailing directed at a purely local election. Counsel concluded that the statute thus does not deny Charter equal protection rights because if the statute were properly enforced, no local candidate, regardless of party, would be eligible to mail campaign literature at special third-class rates.

Even if defendants are correct and the Postal Service has not been vigilant in enforcing its own regulations, that does not render moot the question before us, that is, whether this statute as presently enforced in Cincinnati impermissibly impinges upon plaintiffs' constitutional rights.

paign Committees, the Democratic National Congressional Committee, and the National Republican Congressional Committee;

. . . . .

(C) The term "State Committee" means the organization which, by virtue of the by-laws of a political party, is responsible for the day-to-day operation of such political party at the State level.

39 U.S.C. § 3626.

Under § 3626, qualified organizations receive a lower-than-cost rate for their bulk mailings so long as Congress appropriates the necessary funds to reimburse the Postal Service for any loss resulting from the special third-class rate. 39 U.S.C. § 2401(c). If Congress does not appropriate sufficient funds, the Postal Service may adjust the rates available under § 3626 to make up the amount Congress was to appropriate. 39 U.S.C. § 3627. The history of this statute and the statutory scheme of which it is a party have been thoroughly addressed elsewhere and need not be reiterated here. *Greenberg v. Bolger,* 497 F.Supp. 756, 765–66 (E.D.N.Y.1980).

### IV

■ As a preliminary matter, we point out that we assume without deciding that Charter is a political party for purposes of this action. In other words, we assume that Charter would qualify under § 3626 if it had a state committee.

The Postal Service originally denied Charter's application on the ground that it is a civic organization. However, defendants' arguments do not turn on whether Charter is a civic organization rather than a political party. In addition, the evidence offered by plaintiffs was sufficient to make out a *prima facie* case that Charter is an organized group with some degree of permanence, a common political purpose, and designed to increase political power by electing candidates congenial to its views. *Greenberg,* 497 F.Supp. at 782.

### V

Charter maintains that § 3626 is unconstitutional as applied to it because the statute permits the Postal Service to restrict Charter's access to the mails because of its exclusively local focus, thereby violating Charter's First Amendment rights to freedom of expression and association.

Charter states that it is not a qualified political committee within the meaning of the statute and, moreover, that it cannot become such a committee by virtue of its political belief that its focus must remain exclusively local. Plaintiffs argue that § 3626 unconstitutionally regulates speech on the basis of content, pointing out that Democratic and Republican candidates for City Council are able to communicate their political messages by mail solely because their parties have a state committee. Charter candidates do not have a similar opportunity because Charter has neither the political desire nor the size to establish a state committee. According to plaintiffs, this handicap based on size and political commitment is no different from discrimination based upon content.

Plaintiffs rely primarily on *Greenberg,* in which Judge Weinstein held unconstitutional on both First Amendment and equal protection grounds a section of the 1980 Postal Service Appropriation Act providing that no funds would be available for implementing special third-class rates for qualified political committees other than national, state, or congressional committees of a major or minor party. Plaintiffs in that action were national and state political third parties defined under the pertinent statutes as "new" parties because their candidates received less than 5% of the vote in the preceding presidential election. New parties were ineligible for the special third-class rate. The Court found that the Appropriation Act burdened a new party's access to mail services and constituted a constitutionally impermissible restriction on that party's First Amendment rights. 497 F.Supp. at 774–78. The Court went on to apply an equal protection analysis, concluding that the Appropriation Act was a denial of equal

protection insofar as it impaired plaintiff's First Amendment rights of expression, an impairment entitled to greater weight than the Government's interests in conserving scarce resources and administrative efficiency. 497 F.Supp. at 778–81.

Defendants argue, on the other hand, that plaintiffs have failed to demonstrate their entitlement to preliminary injunctive relief. They maintain that plaintiffs do not have a likelihood of success on the merits, arguing first that plaintiffs have failed to exhaust their administrative remedies by not appealing the denial of their application as permitted by Postal Service Regulations. Further, defendants argue that the First Amendment claim is without merit because the First Amendment does not include the right to mail campaign material at subsidized rates. Finally, defendants maintain that plaintiffs' equal protection rights have not been violated because Congress had a rational basis for differentiating between national and state political committees on one hand and purely local groups on the other hand. The last point defendants make is that if the Court were to decide that a preliminary injunction should issue, a mandatory injunction would be inappropriate. Defendants maintain that nullifying special rates to all political committees would be more appropriate than granting Charter the special rate it seeks.

Defendants rely on the Supreme Court's recent decision in *Regan v. Taxation with Representation of Washington,* —— U.S. ——, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (TWR). TWR, a non-profit corporation organized to promote its views of federal taxation, sought 501(c)(3) status under the Internal Revenue Code. That status is available to certain non-profit organizations that do not engage in substantial lobbying. Contributions to § 501(c)(3) organizations are tax deductible. The Internal Revenue Service denied TWR's application for 501(c)(3) status as a substantial part of TWR's activities involved lobbying. *TWR* asserted that § 501(c)(3)'s prohibition against substantial lobbying is an unconstitutional violation of First Amendment and equal protection rights. The Supreme Court rejected both arguments.

With respect to the First Amendment claim, the Court held that the system enacted by Congress provided a subsidy to certain non-profit organizations by permitting contributions to such organizations to be deducted. This subsidy did not amount to a burden of TWR's First Amendment rights but rather, Congress' decision not to subsidize lobbying. Relying on *Cammarano v. United States,* 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), Justice Rehnquist stated that Congress is not required by the First Amendment to subsidize lobbying. —— U.S. at ——, 103 S.Ct. at 2001.

TWR also contended that it was being denied equal protection as contributions to qualified veterans' organizations engaged in lobbying are tax-deductible. The Court disagreed. Because TWR's First Amendment rights had not been violated, the test was whether the classification was rationally based. The Court held that the statutory distinction between non-profit organizations and non-profit veterans' organizations was rationally related to government's interest in compensating veterans for services rendered to the nation. —— U.S. at —— – ——, 103 S.Ct. at 2002–2003.

Defendants also refer us to *Afriat v. United States Parcel Service,* CV 79–4155–DWW (Px) (C.D.Calif., Sept. 1, 1980). Plaintiff, a Democratic candidate for the state legislature, unsuccessfully sought a declaration that § 3626 denied him freedom of speech and equal protection because it did not allow him, as an individual, to take advantage of the special third-class rate. We do not find *Afriat* relevant to the case before us. The issue at bar is not the constitutionality of § 3626 as it affects individual candidates, but rather its constitutionality as it affects local political parties who run candidates in local elections against candidates who can take advantage of the special rates by virtue of their association with a state political party.

## VI

### A.  *Waiver of Exhaustion Requirement*

■ It is undisputed that Charter did not appeal from the denial of its application for

the special rates and, thus, has not exhausted its administrative remedies. The parties agree that Charter cannot qualify under § 3626 for the special rate because of its exclusive commitment to local government. In addition, they agree that the Postal Service has no discretion under § 3626 to decide that Charter is entitled to the special rate. None of the parties suggested, nor do we see that this case involves significant factual issues. Indeed, we assume without deciding that the issue raised by this action is purely one of law, more precisely the constitutional sufficiency of § 3626 as applied to the facts of this case.

The circumstances, therefore, are similar to those in *Greenberg,* in which the Court found that the agency had impliedly waived the exhaustion requirement on the basis of the factual agreement, the lack of agency discretion, and the lack of agency expertise in resolving questions of law. 497 F.Supp. at 772–73. The Court added that the approaching election was an additional factor in finding a waiver of the exhaustion requirement. We agree with that Court's statement that "the need for speed precludes applications to an administrative body which can only have a foregoing result." *Id.* Accordingly, we conclude that defendants have waived the exhaustion requirement.

### B. *Likelihood of Success on the Merits*

Plaintiffs assert a deprivation of both their First Amendment and their equal protection rights. Because we find a strong likelihood that plaintiffs will succeed on the merits of their First Amendment claim, we find it unnecessary to discuss the equal protection aspect of their claim at this point.

■ Section 3626 is facially content-neutral, that is, one cannot conclude on the basis of the statutory language alone that the statute abridges any group's freedom of speech or association on the basis of the content of the ideas that group wishes to communicate. It is well-established however, that encroachments on First Amendment rights that arise "not through direct Government action, but indirectly as an unintended but inevitable result of the Government's conduct" are just as constitutionally infirm as overt content-based discrimination. *Buckley v. Valeo,* 424 U.S. 1, 65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976).

Defendants, relying on *TWR,* insist that Congress has not restrained Charter's right to free speech, but has merely decided not to subsidize that right. Nevertheless, and regardless of what Congress intended, Strauss' testimony demonstrated that the effect of § 3626 in the 1981 City Council election was to benefit local Republican and Democratic candidates and to obstruct Charter candidates. In our view, the instant case thus poses questions not raised by the facts of *TWR.*

■ Section 3626's effect on the 1981 election was the result of Charter's refusal to associate with or become a state political committee. The effect thus is discrimination based on content, in this case, the political belief that Cincinnati is best served by a political organization committed solely to the betterment of local government. Judge Weinstein stated in *Greenberg:*

> To suggest that a regulation that confers benefits on the basis of popularity is not content-based would require the court to draw on artificial distinction between the popularity and the substance of an idea. The political positions of the plaintiffs, in their view, are substantially different from those of the major parties. By subsidizing the mailings of the Republican and Democrats, the Government has chosen to benefit those with popular views and burden those with unpopular views. To handicap the mailing of campaign literature because a political party has not achieved a required level of acceptance is not different from censoring speech because of its substance. The denial of the postal discount is unacceptable for it "generates costs which burden the exercise of first amendment rights in direct proportion to the number of persons the speaker wants to reach." 497 F.Supp. at 765, 775–76 (quoting *Troyer v. Town of*

*Babylon,* 483 F.Supp. 1135, 1139 (E.D.N. Y.1980).

We are fully aware that *Greenberg* involved national parties and, thus, is factually different from the situation here. Nonetheless, we think Judge Weinstein's reasoning applicable to the situation before us in which the availability of the benefit turns upon a political party's association with a qualified state committee. In the context of Cincinnati City Council elections, § 3626 provides a subsidy to state committees to mail their local candidates' campaign pieces but not to Charter, an exclusively local political party, to mail its candidates' campaign literature. We conclude that plaintiffs have a high likelihood of proving that under the facts of this case, § 3626 discriminates against Charter on the basis of content, thereby abridging Charter's First Amendment rights.

An abridgement of a First Amendment right can be justified only by a compelling governmental interest. In *Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1975), Justice Brennan set forth principles governing First Amendment analysis:

It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny. "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct Government action, but indirectly as an unintended but inevitable result of the Government's conduct ..." *Buckley v. Valeo,* [424 U.S. 1, 65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976)]. Thus, encroachment "cannot be justified upon a mere showing of a legitimate state interest." *Kusper v. Pontikes,* [414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973)]. The interest advanced must be paramount, one of vital importance, and the burden is on the Government to show the existence of such an interest (citations omitted).

■ It is possible that extending the special third-class rate to Charter will result in some loss of revenue. Our research has not revealed any First Amendment cases in which financial considerations have found to be sufficiently compelling to justify an abridgement of First Amendment rights. Conceivably, defendants might advance administrative efficiency as justification for the treatment of Charter under § 3626. Again, however, we have found no cases holding administrative efficiency sufficiently compelling to justify the abridgement of a First Amendment right. Further, in *Frontiero v. Richardson,* 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973), the Supreme Court held in an equal protection case involving sex discrimination that "although efficacious administration of governmental programs is not without some importance, 'the Constitution recognizes higher values than speed and efficiency,'" quoting *Stanley v. Illinois,* 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972).

In conclusion, then, it seems to us that plaintiffs may well succeed on the merits in arguing that § 3626 abridges their First Amendment rights to free speech and free association on the basis of content, and that there are no sufficiently compelling governmental interests to justify such abridgement.

■ Even if we assume *arguendo* that § 3626 does not discriminate against Charter on the basis of content, we nevertheless conclude there is a strong probability that plaintiffs can demonstrate that the statute is constitutionally infirm because it indirectly restricts the flow of information even though enacted to achieve some goal unrelated to communicative content or ideas. Where the result of a statute is to constrict the flow of information or ideas, a court must weigh the extent to which communicative activity is limited against the values or interests served by enforcing the statute. *Wooley v. Maynard,* 430 U.S. 705, 716, 97 S.Ct. 1428, 1436, 51 L.Ed.2d 752 (1977); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1934). *See generally,* L. Tribe, *American Constitutional Law,* 682–88 (1978).

It seems likely that in enacting § 3626 Congress intended to confer a benefit on

national and state parties only. Such a purpose might pass constitutional muster. However, an indirect result in Cincinnati is a restriction on the flow of information insofar as § 3626 restricts Charter's ability to reach voters while enhancing the ability of local parties associated with state-wide organizations. Accordingly, we must balance the extent of the restriction against the values served by the statute.

■ We doubt that under these circumstances that the Postal Service can demonstrate that its interests in administrative efficiency and the saving of revenues outweigh Charter's interest in communicating its ideas and the public's interest in being informed about local candidates. Defendants state that the statute has not limited Charter's access to the voters, noting that Charter did one bulk mailing of its newsletter in August 1983, after being denied the special third-class rate. That argument is immaterial. *See, e.g., Virginia Board of Pharmacy v. Virginia Consumer Council,* 425 U.S. 748, 757, n. 15, 96 S.Ct. 1817, 1823, n. 15, 48 L.Ed.2d 346 (1976), in which the Supreme Court stated that it was irrelevant that consumers might be able to obtain information on the price of prescription drugs in ways other than advertising. Moreover, the test is not whether Charter's ability to communicate has been eliminated, but rather whether it has been limited. Denying Charter the special rate appears to limit its ability to communicate.

■ In addition, it is likely that plaintiffs will be able to demonstrate that the mails are a public forum, *i.e.,* an institution created by the Government for the purpose of communication. If so, the statute can withstand constitutional scrutiny only if it serves a compelling governmental interest and is narrowly drawn to achieve that end. *Perry Education Association v. Perry Local Education Association,* 51 U.S.L.W. 4165, 4167 (Feb. 23, 1978). As the statute is applied in Cincinnati, however, its effect is to enhance the ability of certain candidates to communicate with the voters while not permitting all candidates that same opportunity. *See Greenberg,* 497 F.Supp. at 777–

78. At this stage we cannot conceive of a governmental interest so substantial that it would overcome this effect.

We emphasize that Congress may well have had a legitimate purpose in enacting § 3626. Nonetheless, the effect of this statute as applied in Cincinnati seems to be to provide a benefit to candidates affiliated with state political parties but to deny that benefit to candidates associated with Charter. Although defendants cast the issue in terms of subsidies, we think the terminology is misleading. Of course, Congress can create subsidies. *TWR* re-emphasized that basic principle. And, of course, § 3626 creates a subsidy. But that is only the beginning of the inquiry. We conclude that plaintiffs have demonstrated a strong probability that they can succeed on the merits of their claim that § 3626 either discriminates on the basis of content, or, even if content-neutral, impermissibly restricts the flow of information.

## C. *Irreparable Harm*

■ Having concluded that plaintiffs are likely to succeed in proving that their First Amendment rights have been abridged, we inevitably conclude that plaintiffs will suffer irreparable harm if the injunction does not issue. It is firmly established that the loss of First Amendment freedoms for even the most minimal period of time constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. at 373, 96 S.Ct. at 2689. Defendants point out that the amount of money involved is minimal. That, however, is irrelevant once a constitutional right has been impaired.

In addition, as counsel for plaintiffs pointed out, in the case of political parties, money is not an adequate remedy because money is merely an instrument in the effort to win votes. Charter Director Hamilton testified that the number of pieces which can be mailed in October 1983 depends upon the rate available to Charter.

■ It is not the Court's business to make sure that each political party has access to the same resources, but it is the

Court's business to recognize that in the final analysis financial resources determine a party's power to communicate its political beliefs. For the Government to make resources available to one party but not to another for campaign purposes by subsidizing the mailings of one party and not of the other subjects the unsubsidized party to irreparable injury where an election is imminent.

### D. *Substantial Harm to Others*

■ Defendants argue that granting the special mailing rate to Charter will result in a loss of revenue. Arguing that there are a multitude of local municipal groups like Charter, the Postal Service concludes that the ultimate loss might well be considerable. However, 39 U.S.C. § 3627 permits the Postal Service to adjust the special rates to offset lack of appropriations if Congress does not appropriate funds to support the special rates.

In short, we simply do not see that there is any serious risk of injury to the Postal Service if this injunction issues. Even if the Postal Service cannot make up for the loss by increasing the special rate or by increased Congressional appropriations, the harm to the Postal Service is minimal compared to the harm to Charter if it cannot participate on an equal basis in the upcoming City Council election.

### E. *The Public Interest*

■ If § 3626 has the effect of abridging Charter's First Amendment rights, then it logically follows that the public interest is best served by requiring the Postal Service to make the special rate available to Charter. The public interest is always served when constitutional rights are enforced.

Moreover, the public interest is best served by the most expansive flow of ideas and information. That principle has particular force in the context of an imminent election. The fact that requiring the Postal Service to grant the same special rate to Charter as it grants to state parties might ultimately result in some financial loss to the public, is of minimal weight when balanced against the public's interest in the free flow of information in the context of an election.

### VII

■ In conclusion, our examination of the four factors persuades us that plaintiffs have demonstrated their entitlement to preliminary injunctive relief. Defendants urge that if we decide the injunction should issue, we declare § 3625 null and void rather than ordering the Postal Service to grant Charter the use of the special third-class rate. In our view, to order the relief that defendants urge on us would have enormous ramifications. Defendants, in effect, are asking us to declare that no state party is eligible for the special third-class rate. If we grant defendants' request, our decision, we assume, would have nationwide implications. We find such a result inappropriate at this preliminary stage. Plaintiffs, on the other hand, ask only that we order the Postal Service to allow Charter to use the special third-class rate. If we grant their request, the injunction would operate only with respect to the Charter Committee of Greater Cincinnati.

Given the imminence of the City Council election, we conclude that relief correcting the inequities created by the operation of § 3626 in the Greater Cincinnati area is necessary. However, we also find that relief should be as narrowly tailored as possible. We believe the relief sought by defendants is too sweeping.

Therefore, we order the Postal Service to allow the Charter Committee of Greater Cincinnati to use the special third-class rate available to state parties on the condition that Charter post adequate security for $3,700 in the form of personal guarantees.

SO ORDERED.